**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES CITIZENSHIP &<br>IMMIGRATION SERVICES, *et al.*,<br><br>        Defendants. | Civil Action No. 15-273 (CKK) |

**MEMORANDUM OPINION**
(March 10, 2017)

Plaintiffs in this lawsuit are foreign individuals seeking conditional permanent residence in the United States via the EB-5 Immigrant Investor Program.  Plaintiffs challenge the decision of United States Citizenship & Immigration Services ("USCIS") to deny their petitions under that program as arbitrary and capricious, not supported by substantial evidence, and beyond the scope of USCIS's statutory authority.  Presently before the Court is Plaintiffs' [60] Motion for Summary Judgment and Defendants' [67] Cross-Motion for Summary Judgment on the Administrative Record.

Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court GRANTS-IN-PART and DENIES-IN-PART Plaintiffs' Motion.  The Court

---

[1] The Court's consideration has focused on the following documents:
- Pls.' Mot. for Summ. J. and Memo. in Support ("Pls.' Mot."), ECF Nos. 60, 61;
- Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Cross-Mot. and Opp'n"), ECF Nos. 67, 68;
- Pls.' Opp'n to Defs.' Cross-Mot. for Summ. J. and Reply in Support of Pls.' Mot. for Summ. J. ("Pls.' Opp'n and Reply"), ECF Nos. 69, 70; and
- Defs.' Reply in Support of Defs.' Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 74.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

GRANTS Plaintiffs' Motion in that it finds that certain aspects of USCIS's adjudication of

Plaintiffs' petitions were arbitrary and capricious.  First, the reasoning underlying USCIS's

denial of an initial set of Plaintiffs' petitions was arbitrary and capricious and counter to the

evidence before USCIS.  Second, USCIS's decision to treat the petitions of certain Plaintiffs

differently than others, despite the fact that all of the Plaintiffs presented effectively equivalent

petitions, without providing any explanation for doing so, was also arbitrary and capricious.  The

Court DENIES Plaintiffs' Motion to the extent it requests the Court order Plaintiffs' petitions

granted, and will instead REMAND this case to USCIS for further consideration of Plaintiffs'

petitions consistent with this Memorandum Opinion.  Defendants' Cross-Motion is DENIED.

## I.  BACKGROUND

### A.  Statutory and Regulatory Background

The EB-5 Program was created by Congress as part of the Immigration Act of 1990.  *See*

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat 4978.  The program is codified at 8

U.S.C. § 1153(b)(5).  Pursuant to the EB-5 Program, "[v]isas shall be made available . . . to

qualified immigrants seeking to enter the United States for the purpose of engaging in a new

commercial enterprise (including a limited partnership) (i) in which such alien has invested . . .

or, is actively in the process of investing, capital in an amount not less than the amount specified

in subparagraph (C), and (ii) which will benefit the United States economy and create full-time

employment for not fewer than 10 United States citizens or aliens lawfully admitted for

permanent residence or other immigrants lawfully authorized to be employed in the United

States (other than the immigrant and the immigrant's spouse, sons, or daughters)."  8 U.S.C. §

1153(b)(5)(A).  Subparagraph (C) sets the amount of capital that must be invested in order to

participate in the program at $1,000,000.  *Id.* § 1153(b)(5)(C)(i).  However, the statute also

provides that the Attorney General may reduce the required amount of investment for

investments made in "targeted employment areas" ("TEA's"), *id.* § 1153(b)(5)(C)(ii), which are defined as "a rural area or an area which has experienced high unemployment (of at least 150 percent of the national average rate)," *id.* § 1153(b)(5)(B)(ii).  By regulation that reduced amount has been set at $500,000.  8 C.F.R. § 204.6(f)(2).

The Immigration and Naturalization Service—an agency that no longer exists under that name—published regulations regarding the EB-5 Program in 1991.  These regulations set forth the requirements for classifying an alien under the EB-5 Program, including, preliminarily, the filing of a Form I–526 Immigrant Petition by Alien Entrepreneur, *id.* § 204.6(a), which "must be accompanied by evidence that the alien has invested or is actively in the process of investing lawfully obtained capital in a new commercial enterprise in the United States which will create full-time positions for not fewer than 10 qualifying employees," *id.* § 204.6(j).  As particularly relevant to this Memorandum Opinion, these regulations more specifically require that, "[t]o show that the petitioner has invested or is actively in the process of investing the required amount of capital, the petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk."  *Id.* § 204.6(j)(2).  The regulations also define "invest" for the purposes of the EB-5 Program as meaning "to contribute capital."  *Id.* § 204.6(e).  They state that "[a] contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the alien entrepreneur and the new commercial enterprise does not constitute a contribution of capital for the purposes of this part."  *Id.*

**B.  Factual Background**

**1.  The Investment**

Plaintiffs in this case are foreign individuals who filed Form I–526 petitions with USCIS

seeking permanent residence in the United States under the EB-5 Program.  Each of the Plaintiffs

filed their petitions based on the same investment: a $500,000 contribution to an Idaho Limited

Partnership entitled Quartzburg Gold, LP ("Quartzburg Gold").  *See* JohnDoe1000006-13;

JohnDoe2000001-3; JohnDoe3000002-5; *see also* JohnDoe1000057 (Quartzburg Gold, LP

Certificate of Limited Partnership).  The Plaintiff-investors were to serve as the limited partners

in Quartzburg Gold, and an entity entitled ISR Capital, LLC, an Idaho Limited Liability

Company, was to serve as its general partner.  *See generally* JohnDoe1000202-33 (Quartzburg

Gold, LP Limited Partnership Agreement) ("LPA"); *see also* JohnDoe1000058 (ISR Capital

LLC Certificate of Organization).[2]

Quartzburg Gold's business plan was presented to the Plaintiff-investors in a Confidential

Private Offering Memorandum ("Offering Memorandum").  JohnDoe1000059-125.  In sum, the

---

[2] The Plaintiff-investors in Quartzburg Gold entered into three interrelated agreements: the LPA, JohnDoe1000202-33, a Master Escrow Agreement, JohnDoe1000148-77 ("Escrow Agreement"), and a Limited Partner Interest Subscription Agreement, JohnDoe1000190-201 ("Subscription Agreement").  The terms of the limited partnership, including the rights of the Plaintiff-investors, were set forth in the LPA.  Under the LPA, in return for their capital contributions the limited partners, in aggregate, were entitled to an 80% share of the partnership, with the general partner retaining the remaining 20%.  JohnDoe1000207.  Under the Escrow Agreement, U.S. Bank National Association agreed, in return for fees paid by Quartzburg Gold, to serve as an escrow agent and hold each investor's capital contribution pending approval of the investor's Form I-526 petition, at which time it would disburse those funds to Quartzburg Gold.  JohnDoe1000160. The Subscription Agreement provided that the Plaintiff-investor would be admitted into Quartzburg Gold as a limited partner upon release of his or her $500,000 capital contribution pursuant to the Escrow Agreement.  JohnDoe1000190-91.  The Subscription Agreement also contained numerous warnings that the Plaintiff-investor's capital was being placed at considerable risk.  *See, e.g.*, JohnDoe1000193 ("[a]n investment in the Partnership is highly speculative and the Subscriber may suffer a complete loss of its investment").

Offering Memorandum stated that Quartzburg Gold intended to aggregate the Plaintiff-investors'

$500,000 contributions and use them to finance several gold mining projects (the "Projects").

JohnDoe1000063.  This financing would take the form of a loan (the "ISGC Loan") of the

aggregate amount of the Plaintiff-investors' capital contributions to an entity entitled Idaho State

Gold Company, LLC ("ISGC").  *Id.*  ISGC would in turn loan or invest the money it borrowed

from Quartzburg Gold into several "Mining Companies" that would then pursue the Projects.  *Id.*

The Offering Memorandum explained how Quartzburg Gold hoped to generate a profit for the

Plaintiff-investors, and also the risks associated with the investment:

> The Partnership hopes to receive a return on its investments in the form of interest
> payments by [ISGC] on the ISGC Loan made by the Partnership.  The sole source
> of funds for [ISGC] to make interest payments on the ISGC Loan and to repay the
> principal amount of the ISGC Loan on maturity will be profits [ISGC] and the
> Mining Companies intend to achieve through successful operation of the Projects.
> If the Projects are not successful in generating sufficient revenues, then the Mining
> Companies will not be able to repay the Mining Company Loans from [ISGC], in
> a case where [ISGC] has lent funds to the Project, or provide sufficient returns on
> ISGC's equity investment, in a case where [ISGC] has made an equity investment
> in the Project.  In this situation, ISGC in turn will not have sufficient funds to repay
> the ISGC Loan from the Partnership, and the Partnership will suffer a partial or
> total loss of its investment.

*Id.*  Because the success of the investment was dependent on risky mining projects, the Offering

Memorandum made clear—as indeed did nearly all of the Quartzburg Gold documents in the

record—that the Plaintiff-investors' capital was at risk, and that the chance of receiving a return

on that capital was speculative.  *See, e.g.*, JohnDoe1000070 ("[i]nvestment in the Partnership is

speculative and involves a high degree of risk . . . an investment in the Partnership is subject to

the risks normally encountered in the resource exploration, development and mining business");

*see also* JohnDoe1000193 ("an investment in the Limited Partner Interests is a speculative

investment that involves a high degree of risk, including the risk of loss of the entire investment

of the Subscriber in the Partnership").

### 2.  The Call Option

Despite the risk, if Quartzburg Gold turned out to be profitable and received sufficient

returns from the ISGC Loan such that it had funds available to distribute to the Plaintiff-

investors, a provision in the LPA referred to as a "Call Option" would come into play.  The Call

Option provision allowed the general partner of Quartzburg Gold to effectively cap the return of

the Plaintiff-investors at a certain level by giving the general partner the right, but not the

obligation, to "repurchase the interest of a Limited Partner for a purchase price of either (i)

$550,000 in cash, or (ii) 400 ounces of gold (99% purity)."  JohnDoe1000065-66.  The Call

Option, provided for in section 12.11 of the LPA, stated in relevant part that:

> (1) <u>General</u>.  The Partnership shall have an option ("Call Option"), but not an
> obligation, to purchase the entire Interest owned by a Limited Partner . . .  from
> such Limited Partner . . . the Partnership may exercise the Call Option at any time
> by delivering written notice ("Repurchase Notice") to the Seller of its election to
> purchase.  Upon delivery of a Repurchase Notice to a Limited Partner, the
> Partnership shall be obligated to purchase, and each Seller shall be obligated to sell,
> the Interest, at a purchase price equal to the Applicable Call Option Price [$550,000
> in cash or 400 ounces of gold].

JohnDoe1000219.  In other words, if the mining projects were successful such that the Plaintiff-

investor's interest in Quartzburg Gold exceeded a certain value somewhat higher than its original

cost, the Call Option allowed the partnership to buy back that interest at that increased value and

then to retain any additional profits the partnership went on to generate for itself.

JohnDoe1000066 ("In the event the Partnership exercises the call option, any additional profits

from the Projects [would] be retained by [ISGC] and/or the General Partner.").

Importantly, the Call Option was a right exercisable by Quartzburg Gold or its general

partner, *not* the Plaintiff-investors, and the Quartzburg Gold documents made clear that there

was no guarantee that it would be exercised.  Despite statements that the general partner would

strive to be *able* to exercise this option and buy out the Plaintiff-investors, both the LPA and the

Offering Memorandum made clear that "[t]here [was] no guarantee regarding when the

Partnership shall exercise such call option, or if such call option shall ever be exercised at all."

*Id.*  Indeed, the LPA expressly provided:

> (3) <u>No Guaranteed Redemption</u>.  For the avoidance of doubt, there is no guaranteed redemption or repurchase of a Limited Partner's Interest and the General Partner is under no obligation to exercise the Call Option. The Limited Partners acknowledge that the Partnership's ability to exercise the Call Option and redeem the Interest of a Limited Partner is entirely dependent upon the repayment of the ISGC Loan by Idaho State Gold Company. The ability of [ISGC] to repay the ISGC Loan, in turn, is entirely dependent upon repayment of the Mining Company Loans and the success of the Projects. . . .

JohnDoe1000220.  The Call Option accordingly did not guarantee Plaintiff-investors

anything, nor did it have any effect on the risk that the Plaintiff-investors faced that they

might lose their capital contributions if the underlying mining projects were not

successful.

### 3.  USCIS' Preliminary Responses to Plaintiffs' Petitions

Before beginning to issue the denials that are the subject of this lawsuit, USCIS sent

Plaintiffs several preliminary communications notifying them of its intent to deny Plaintiffs'

petitions and requesting additional evidence to address several perceived deficiencies therein.

First, most of the Plaintiffs received from USCIS a "Notice of Intent to Deny" their Petitions

("NOID").  JohnDoe2000397-405; JohnDoe3000402-11.  In the NOID, USCIS took the position

that the Plaintiffs had not provided sufficient evidence of the following in support of their

petitions: (1) that the job creating entities associated with the investment were located in a TEA,

(2) that the minimum investment amount had been met, (3) that the capital invested was actually

at risk, and (4) that the investment would create at least 10 full time positions for qualifying

employees.  *Id.*

Plaintiffs, through their shared representatives, each subsequently provided additional materials in response to the NOID.  USCIS responded to those additional materials by issuing two Requests for Evidence ("RFE's"), in which USCIS requested additional evidence regarding such issues as whether the investment would create the required amount of employment and whether Plaintiffs' capital would genuinely be placed at risk.  *See* JohnDoe1001591-602; JohnDoe2001964-68; JohnDoe2002234-46; JohnDoe3001591-95; JohnDoe3001861-72.  Again, Plaintiffs submitted additional materials responding to the issues raised in the RFE's.  With small differences not relevant to this Memorandum Opinion, this process was substantially the same for all Plaintiffs.

### 4.  USCIS' Denials of Plaintiffs' Petitions

After this initial round of notices and requests, USCIS began issuing denials to Plaintiffs' petitions on a rolling basis.  Despite the fact that all of the Plaintiffs' petitions were—at least for the purposes of this Memorandum Opinion—functionally equivalent, USCIS issued three different denial notices, each citing a different set of reasons for denying the petitions.

#### a.  The First Denial

Although recognizing that other concerns had been raised during the NOID and RFE process, the first denial received by a number of the Plaintiffs (the "First Denial") stated that the Plaintiff had not established his or her eligibility for the EB-5 Program for a single reason: the capital Plaintiff intended to contribute would not be "at risk."  JohnDoe2003122.

More specifically, the First Denial stated that the Plaintiff was required to demonstrate that he or she would "invest" the required amount of capital, and that to do so the Plaintiff had to show that the capital was "at risk" and not contributed pursuant to a "debt arrangement."  *Id.*

8

Relying on the precedent decision *Matter of Izummi*,[3] USCIS wrote that "[f]or the alien's money truly to be at risk, the alien cannot enter into a partnership knowing that he already has a willing buyer in a certain number of years, nor can he be assured that he will receive a certain price. Otherwise, the arrangement is nothing more than a loan." *Id.* (quoting *Matter of Izummi*, 22 I. & N. Dec. 169, 186 (BIA 1998)). The First Denial also stated that "[a]n investment assumes that risk exists; thus, the immigrant investor must go into the investment not knowing for sure if he or she will be able to sell his or her interest at all after he or she obtains his or her unconditional permanent resident status, and if he or she is successful in selling his or her interest, the sale price may be disappointingly low or surprisingly high. This way the immigrant investor risks both gain and loss." JohnDoe2003122-23.

According to the First Denial, such risk was not present in the Plaintiff's investment in Quartzburg Gold because of the Call Option. JohnDoe2003123. The extent of USCIS's analysis on this point was that "[a] 'call option' is suggestive of a prohibited redemption mechanism whereby an issuer has the ability to 'call' (redeem) the covered securities in exchange for agreed upon consideration . . . [t]his 'call option' can be more accurately characterized as a guaranteed return. *Matter of Izummi* prohibits redemption agreements and guaranteed returns." *Id.* The First Denial also notes that the Plaintiff had attempted to remedy this perceived problem after it was raised during the NOID and RFE process by removing the Call Option from the LPA, but found that this was not sufficient because the Plaintiff was required to establish his or her

---

[3] *Matter of Izummi* is one of four published "precedent decisions" relating to the EB-5 Program. These precedent decisions "serve as precedents in all proceedings involving the same issue(s)." 8 C.F.R. § 103.3(c). "Except as these decisions may be modified or overruled by later precedent decisions, they are binding on all Service employees in the administration of the Act." *Id.*

eligibility for the EB-5 Program at the time of the filing of his or her petition, and was not

allowed to make "material changes" to the proposed investment thereafter. *Id.*

      *b. The Second Denial*

      USCIS had not issued the First Denial to all of the Plaintiffs by the time this lawsuit was

filed.  After the suit was filed, USCIS began issuing those Plaintiffs who had not yet received a

final decision on their petitions a new and different denial notice (the "Second Denial").

JohnDoe3002479-97.  The Second Denial similarly—although with different reasoning—cites

the failure of the Plaintiff to place his or her capital at risk due to the Call

Option, JohnDoe3002487-2490, and also adds three additional reasons for denying the petition

that were not present in the First Denial, JohnDoe3002484-96.  The Second Denial states that the

Plaintiff had not demonstrated that the job creating entities associated with the investment were

located in a TEA, and therefore that the reduced $500,000 investment amount was

sufficient.  JohnDoe3002486.  The Second Denial also cites USCIS's determination that the

Plaintiff had not shown, as required, that the full amount of capital would be made available to

the business most closely responsible for creating the required employment.

JohnDoe3002490.   USCIS determined that this requirement had not been met for a number of

reasons.  First, USCIS determined that it was not clear how both a licensing fee and a loan/equity

fee called for in the partnership documents would be paid if not from the Plaintiffs' capital

contributions, and therefore the money used to pay those fees would not be received by the

actual mining projects that were to create the requisite employment.  JohnDoe3002491-93.

Second, USCIS determined that money that had been spent on startup costs for a mining project

that was subsequently abandoned by the partnership also was not made available to the business

most closely related to job creation.  JohnDoe3002494.  Finally, the Second Denial also stated

that the Plaintiff had not demonstrated that the investment would create full time employment for

at least ten qualifying employees, because the mining projects the investment intended to fund continued to change throughout the petition period.  JohnDoe3002496.  With the exception of the Call Option, none of these reasons for denial appeared in the First Denial.

####   c.   The Third Denial

Finally, a single Plaintiff received a slightly different denial than any other (the "Third Denial").  This unique denial included several reasons for denial that were present in the Second Denial, including that the Plaintiff had not demonstrated that the full amount of capital had been made available to the business most closely responsible for job creation because of the issues with the licensing fee, the loan/equity fee and the abandonment of the mining project, but omitted all other reasons.  JohnDoe1002454-62.[4]

## C.  Procedural History

Plaintiffs filed their original Complaint in this case on February 24, 2015.  Compl. for Decl. Relief, ECF No. 1.  At that time, USCIS had not issued final decisions on all of the Plaintiffs' petitions, and the only form of denial that had been issued was the First Denial.  *Id.* Plaintiffs asserted that the issuance of the First Denial violated the Administrative Procedure Act ("APA"), Congressional intent and their due process rights.  *Id.* ¶¶ 28-43.

On May 11, 2015, Defendants filed a Partial Motion to Dismiss.  Defs.' Partial Mot. to Dismiss, ECF No. 16.  Defendants argued that the claims of those Plaintiffs who had not yet received final decisions on their petitions should be dismissed.  *Id.*  Defendants also argued that

---

[4] USCIS also issued denial notices to two Plaintiff-investors that, in addition to citing the reasons for denial listed in the Second Denial, also took the position that those two Plaintiff-investors had failed to demonstrate that a lawful source of funds had been used to make their investments. Plaintiffs represent that USCIS has agreed to allow these Plaintiff-investors to address these issues anew if Plaintiffs receive a favorable ruling in this case on the issues that are common to all Plaintiff-investors, and that accordingly any issues that are unique to these two Plaintiff-investors need not be addressed by the Court at this time.

USCIS had recently begun to issue materially different denials to certain Plaintiffs—the Second

Denial—and that the claims of those Plaintiffs that had received that new form of denial should

also be dismissed because they were different than the claims in the Complaint. *Id.* at 4.

Plaintiffs opposed this motion. Pls.' Resp. in Opp'n to Defs.' Partial Mot. to Dismiss, ECF No.

19.

Defendants eventually consented to the denial without prejudice of their motion to

dismiss after Plaintiffs filed an Amended Complaint that addressed both the First and Second

Denials. Notice in Resp. to Court Order, ECF No. 24. Defendants then filed an Answer to the

Amended Complaint on June 15, 2015, Defs.' Answer by Common Traverse, ECF No. 26, and

the Court proceeded to set a briefing schedule for motions for summary judgment.[5] The parties

thereafter agreed that the administrative record in this case would contain the documents

associated with a single representative Plaintiff that had received each of the forms of denial at

issue. Defs.' Certified Contents of Administrative Record, ECF No. 36. The parties then filed

and briefed cross-motions for summary judgment on this representative administrative record,

which are now ripe for resolution.

## II.  LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." However, "when a party seeks

review of agency action under the APA [before a district court], the district judge sits as an

appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v.*

---

[5] Defendants subsequently consented to the filing of a Second Amended, and a now-operative
Third Amended, Complaint to allow Plaintiffs to correct various minor issues in their pleading.

*Thompson,* 269 F.3d 1077, 1083 (D.C. Cir. 2001).  Accordingly, "the standard set forth in Rule 56[ ] does not apply because of the limited role of a court in reviewing the administrative record . . . . Summary judgment is [ ] the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Southeast Conference v. Vilsack,* 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "This is a 'narrow' standard of review as courts defer to the agency's expertise."  *Ctr. for Food Safety v. Salazar,* 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).  However, an agency is still required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (internal quotation omitted).  "Moreover, an agency cannot 'fail[ ] to consider an important aspect of the problem' or 'offer[ ] an explanation for its decision that runs counter to the evidence' before it."  *Dist. Hosp. Partners, L.P. v. Burwell,* 786 F.3d 46, 57 (D.C. Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43).

## III.  DISCUSSION

The Court concludes that USCIS's adjudication of Plaintiffs' petitions was arbitrary and capricious in two ways.  First, the Court finds that the reasoning underlying USCIS's First Denial, that the Call Option gave the Plaintiffs a "guaranteed return" which meant that their

capital was not "at risk," was arbitrary and capricious and counter to the evidence that was before it.  Second, the Court finds that by issuing various different denials, even though each Plaintiff's petition and supporting documents were functionally equivalent, USCIS acted arbitrarily by treating similar—indeed practically identical—cases dissimilarly without providing any reason for doing so.  Accordingly, the Court will remand all of Plaintiffs' petitions to USCIS for further consideration consistent with this Memorandum Opinion.

## A.  The Reasoning Underlying the First Denial

First, the Court determines that the reasoning in USCIS's First Denial was arbitrary and capricious and counter to the evidence before it.  The only reason given for denying the petitions of the Plaintiffs who were issued the First Denial was that the Call Option provided for in the LPA meant that Plaintiffs had not placed their capital "at risk."  JohnDoe2003122.  The First Denial stated that "the Petitioner had not shown, by a preponderance of the evidence, that the capital invested was at risk due to the call option."  JohnDoe2003123.  USCIS's explanation for this statement was that "[a] 'call option' is suggestive of a prohibited redemption mechanism whereby an issuer has the ability to 'call' (redeem) the covered securities in exchange for agreed upon consideration.  This call option can be more accurately characterized as a guaranteed return.  *Matter of Izzumi* prohibits redemption agreements and guaranteed returns."  *Id.*

Although arbitrary and capricious review is "highly deferential," an agency decision will not be upheld if it "is not supported by substantial evidence, or the agency has made a clear error in judgment."  *Hagelin v. Fed. Election Comm'n*, 411 F.3d 237, 242 (D.C. Cir. 2005) (quoting *AT&T Corp. v. F.C.C.*, 220 F.3d 607, 616 (D.C. Cir. 2000)).  The Court is compelled to conclude that such an error has occurred here.  The record before USCIS made it clear that the Call Option in this case was not a "guaranteed return" and did not insulate the capital invested by Plaintiffs

14

from risk.  Plaintiffs were not guaranteed to receive *any* of their capital contributions back, let alone make any return on their investments.  Their contributions were to be used almost exclusively to fund various mining projects, which are inherently risky endeavors, and Plaintiffs' opportunity to receive any of their money back depended entirely on the success of those projects.

The Call Option did not affect this risk.  The partnership materials did not guarantee Plaintiffs the right to exercise the Call Option and receive the Call Option price for their interests.  To the contrary, the Call Option was a right exercisable only by the general partner. The Call Option could accordingly act as a ceiling on the return Plaintiffs might receive from their investment, but it was not a "guaranteed return."  Plaintiffs raised these points with USCIS before it rendered its decision, and yet USCIS nonetheless issued the First Denial on the grounds that the Call Option meant that Plaintiffs' capital was not "at risk," with the extremely minimal, and unpersuasive, explanation that "[a] 'call option' is *suggestive* of a prohibited redemption mechanism."  JohnDoe2003123 (emphasis added).

In reaching this conclusion, USCIS relied heavily in its decision on *Matter of Izummi*, but that reliance was misplaced.  In *Matter of Izummi*, the petitioner was denied classification as an alien entrepreneur under the EB-5 Program and that decision was affirmed by the Board of Immigration Appeals ("BIA").  *Matter of Izummi*, 22 I. & N. Dec. at 170.  The petitioner in that matter had made his "investment" in the form of a $500,000 "promissory note" to a partnership. *Id.* at 171.  As relevant to this case, the BIA determined that the $500,000 was not truly at risk in part because the investment agreement contained a "sell option."  *Id.* at 184.  The sell option gave the *petitioner* in that case the right to require the partnership buy back his limited partnership interest for a certain amount after a set period of time.  *Id.*  The BIA explained that

this sell option meant that the petitioner's capital was not sufficiently at risk because "it is guaranteed to be returned, regardless of the success or failure of the business." *Id.* The BIA determined that this was "in essence, a debt arrangement in which [petitioner] provides funds in exchange for an unconditional, contractual promise that it will be repaid later at a fixed maturity date (six months later)" and that "[s]uch an arrangement is specifically prohibited by the regulations." *Id.* (citing 8 C.F.R. § 204.6(e)).

The characteristics of the sell option in *Matter of Izzumi* that the BIA determined were disqualifying—at least as relevant to the reasoning in the First Denial—are not present in the Call Option that is at issue in this case. Unlike the sell option in *Matter of Izummi*, which insulated the petitioner's capital from risk because it provided the petitioner with a right to receive its capital back at a set price, the Call Option does not provide the Plaintiffs in this case with any rights. Unlike in *Matter of Izummi*, no guarantees were made to the Plaintiffs in this case that their capital would be returned regardless of the success or failure of the business. The Call Option gave Quartzburg Gold's general partner the right to repurchase the Plaintiffs' interests if the business was successful, but that right did not limit the substantial risk that Plaintiffs' investment could be wholly lost if the business was unsuccessful. Accordingly, at least as relied on in the First Denial, *Matter of Izzumi* was inapposite to the case at hand and did not support the reasoning in the First Denial. That reasoning was arbitrary and capricious and cannot be upheld.

## B.  Disparate Treatment of Petitioners

Second, the Court finds that USCIS acted arbitrarily and capriciously when it issued denial notices to the Plaintiffs who had not yet received decisions on their petitions at the time of the filing of this lawsuit that were different than the denials issued to other Plaintiffs. "A long line of precedent has established that an agency action is arbitrary when the agency offered

16

insufficient reasons for treating similar situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996); *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 28 (D.D.C. 1997) ("The disparate treatment of functionally indistinguishable products is the essence of the meaning of arbitrary and capricious").  "It is axiomatic that '[a]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.'" *Kreis v. Sec'y of Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005) (quoting *Indep. Petroleum Ass'n of Am. v. Babbitt,* 92 F.3d 1248, 1258 (D.C. Cir. 1996)).

In this case, each of the Plaintiffs' petitions were equivalent in all of the ways that the Court can discern would be relevant to the reasons USCIS's gave for its denials.  Each Plaintiff based his or her petition on the same investment and provided virtually the same supporting documentation.  Nonetheless, at least three different denial notices were issued, each citing a different set of reasons that the petitions were deficient.  The First Denial cited only the Call Option.  The Second Denial cited the Call Option as well as other perceived deficiencies that were absent from the First Denial.  The Third Denial cited some of the deficiencies in the Second Denial, but omitted others, including the perceived issues with the Call Option.

Importantly, some of the issues that were cited in the later denials had been raised by USCIS during the adjudication process before the issuance of the First Denial.  When those issues did not appear as cited deficiencies in the First Denial, it gave the strong impression that Plaintiffs' responses regarding them during the adjudication process had satisfied USCIS that those issues were not grounds for denial.  In fact, the First Denial made this impression explicit with regard to one of the deficiencies cited in the later denials—Plaintiffs' perceived failure to establish that the investment was located in a TEA.  In direct contradiction to the later Denials, which cite this as a reason for denial, the First Denial stated that the "investment is located

within a Targeted Employment Area ('TEA')." JohnDoe2003120. USCIS provided no reason

why these perceived deficiencies warranted denying the petitions of certain Plaintiffs and yet

were not problematic for others, despite the fact that all of the Plaintiffs' petitions were

functionally equivalent. This constitutes arbitrary agency action. *See Wilhelmus v. Geren*, 796

F. Supp. 2d 157, 162 (D.D.C. 2011) (holding that "[n]othing could be more arbitrary or

capricious" than "two identical cases [being] decided differently").[6]

Defendants offer no rationale for treating these similar cases dissimilarly.[7] They merely

suggest in a footnote that the First Denial has been somehow "subsumed" by the later ones.

Defs.' Cross-Mot. and Opp'n at 8 n.9. Accordingly, Defendants ask the Court to only consider

the merits of the later denials (which presumably Defendants view as their most robust) and

remand the First Denials for further consideration "in a manner consistent with the Court's

decision." Defs.' Reply at 1. The Court finds this approach unsatisfactory. In arguing for this

approach, Defendants ignore Plaintiffs' correct assertion that the reasoning behind the Second

and Third Denials is arbitrary and capricious because it treated the Plaintiffs who received those

denials differently than the Plaintiffs who received the First Denial without providing any

explanation for doing so. Because the Court agrees that this unexplained disparate treatment

---

[6] The only meaningful difference between any of the petitions that the Court can discern is that the sole Plaintiff who received the Third Denial filed his petition after the general partner of Quartzburg Gold had waived its right to exercise the Call Option, which presumably would explain why USCIS did not cite the Call Option in the Third Denial. But USCIS offers no explanation for why the various issues it found problematic with this Plaintiff's petition, aside from the Call Option, were not equally problematic with respect to the petitions of the Plaintiffs who received the First Denial, which was silent regarding those issues.

[7] Defendants do respond to Plaintiffs' distinct argument that the Second and Third Denials were improperly issued because they came after an "appeal" had been taken with this Court. Defs.' Cross-Mot. and Opp'n at 7 n.8; Defs.' Reply. at 3-4. This response, however, does not address the fact that the Plaintiffs were treated differently for no apparent reason, which is the basis upon which the Court remands the petitions at issue to USCIS.

renders the issuance of the Second and Third Denials arbitrary and capricious, the Court will not at this time consider whether the particular reasons given in those denials are deficient for any other reasons.

In sum, the Court agrees with Plaintiffs that USCIS's adjudication of their petitions was arbitrary and capricious in two ways. USCIS's reasoning in its First Denial was arbitrary and capricious and counter to the evidence before USCIS because the Call Option was not a guaranteed return that limited Plaintiffs' investment risk. Second, USCIS's decision to treat various groups of Plaintiffs differently despite the fact that all of the Plaintiffs submitted effectively the same petitions, without providing any explanation for doing so, was also arbitrary and capricious. Other than concluding that such unexplained disparate treatment of similar petitions was arbitrary and capricious, the Court has not at this time made any decision as to the merits of the reasons for denying Plaintiffs' petitions that were provided in the Second or Third Denials.

## C.  The Appropriate Remedy

Remaining for the Court to determine is the appropriate remedy and course of action for this case going forward. Plaintiffs argue that the Court should order that all of Plaintiffs' petitions be granted. Pl.'s Mot. at 12, 15. The Court concludes that this would not be appropriate. "As the Supreme Court has instructed . . . where 'the record before the agency does not support the agency action, . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999) (quoting *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)). Especially "in the field of immigration," where "there may be sensitive issues lurking that are beyond the ken of the court," the "course of prudence" is to remand the case to

19

USCIS for reconsideration of Plaintiffs' petitions. *Fox v. Clinton*, 684 F.3d 67, 80 (D.C. Cir. 2012).

Accordingly, the Court will remand all of Plaintiffs' petitions for reconsideration by USCIS consistent with this Memorandum Opinion. On remand, the USCIS shall be free to exercise its discretion to reopen the administrative record, to engage in additional fact-finding, to supplement its explanation, and to reach the same or a different ultimate conclusion. However, at a minimum USCIS must provide new responses to all of Plaintiffs' petitions with reasoning that is consistent with the conclusions in this Memorandum Opinion, including an explanation of why various Plaintiffs originally received varying denial notices. Going forward, USCIS must either treat all of the Plaintiffs' petitions in the same manner, or sufficiently explain its reasons for treating them differently. *See Colorado Interstate Gas Co. v. F.E.R.C.*, 146 F.3d 889, 893 (D.C. Cir. 1998) ("Because it has not adequately explained its decision to treat [entities] differently in a context where they appear similarly situated, we remand the case to the Commission for a fuller explanation").

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS-IN-PART and DENIES-IN-PART Plaintiffs' [60] Motion, REMANDS this case to USCIS for further consideration of Plaintiffs' petitions, and DENIES Defendants' [67] Cross-Motion. An appropriate Order accompanies this Memorandum Opinion.

          /s/                          
COLLEEN KOLLAR-KOTELLY
United States District Judge