**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOHN DOE, *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>UNITED STATES CITIZENSHIP &<br>IMMIGRATION SERVICES, *et al.*,<br><br>          Defendants. | Civil Action No. 15-273 (CKK) |

**MEMORANDUM OPINION**
(October 11, 2019)

Plaintiffs in this lawsuit are foreign individuals seeking conditional permanent residence in the United States via the EB-5 Immigrant Investor Program. The United States Citizenship & Immigration Services ("USCIS") denied Plaintiffs' visa petitions under that program. Pursuant to the Administrative Procedure Act ("APA"), Plaintiffs challenge that denial as arbitrary and capricious, unsupported by substantial evidence, beyond the scope of USCIS's statutory authority, in violation of congressional intent, and contrary to their Constitutional rights. Presently before the Court are Plaintiffs' [144] Motion for Summary Judgment and USCIS's [146] Cross-Motion for Summary Judgment.

Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court DENIES Plaintiffs' Motion and GRANTS USCIS's Cross-Motion. USCIS

---

[1] The Court's consideration has focused on the following documents:
- Pls.' Mot. for Summ. J. and Memo. of Law in Support ("Pls.' Mot."), ECF No. 144;
- Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Cross-Mot. and Opp'n"), ECF No. 146;
- Pls.' Res. to Defs.' Mot. for Summ. J. and Reply to Defs.' Res. to Pls.' Mot. for Summ. J. ("Pls.' Opp'n and Reply"), ECF No. 149; and
- Defs.' Res. in Support of Cross-Mot. for Summ. J. and Reply in Opp'n to Pls.' Res. ("Defs.' Reply"), ECF No. 151.

denied Plaintiffs' visa petitions because Plaintiffs failed to establish that it was more likely than not that the Job Creating Entities which would receive Plaintiffs' investments were principally doing business in a Targeted Employment Area. Additionally and independently, USCIS denied Plaintiffs' visa petitions because Plaintiffs failed to establish that it was more likely than not that their investments would create full time positions for at least ten qualifying employees.[2] The Court concludes that the denial on either ground was reasonable and not arbitrary and capricious, not unsupported by substantial evidence, not beyond the scope of USCIS's statutory authority, not in violation of congressional intent, and not contrary to Plaintiffs' Constitutional rights.

## I. BACKGROUND

### A. Statutory and Regulatory Background

The EB-5 Program was created by Congress as part of the Immigration Act of 1990. *See* Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat 4978. The program is codified at 8 U.S.C. § 1153(b)(5). Pursuant to the EB-5 Program, "[v]isas shall be made available . . . to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise (including a limited partnership) (i) in which such alien has invested . . . or, is actively in the process of investing, capital in an amount not less than the amount specified in subparagraph (C), and (ii) which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United

---

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

[2] USCIS further denied Plaintiffs' visa petitions because Plaintiffs failed to establish that the required amount of capital was made available to the businesses which were most closely responsible for creating the employment upon which Plaintiffs' petitions were based. However, as the Court has already determined that the visa petition denials were proper for two independent reasons, the Court need not address this third ground for denial.

States (other than the immigrant and the immigrant's spouse, sons, or daughters)." 8 U.S.C. §

1153(b)(5)(A). Subparagraph (C) sets the amount of capital that must be invested in order to

participate in the program at $1,000,000. *Id.* § 1153(b)(5)(C)(i). However, the statute also

provides that the Attorney General may reduce the required amount of investment for

investments made in "targeted employment areas" ("TEAs"), which are defined as "a rural area

or an area which has experienced high unemployment (of at least 150 percent of the national

average rate)." *Id.* § 1153(b)(5)(C)(ii), § 1153(b)(5)(B)(ii). By regulation, that reduced amount

has been set at $500,000. 8 C.F.R. § 204.6(f)(2).

The Immigration and Naturalization Service—an agency that no longer exists under that

name—published regulations regarding the EB-5 Program in 1991. These regulations set forth

the requirements for classifying an alien under the EB-5 Program, including, preliminarily, the

filing of a Form I-526 Immigrant Petition by Alien Entrepreneur, which "must be accompanied

by evidence that the alien has invested or is actively in the process of investing lawfully obtained

capital in a new commercial enterprise in the United States which will create full-time positions

for not fewer than 10 qualifying employees." *Id.* § 204.6(a), (j). An immigrant investor must

"establish that he or she is eligible for the requested benefit at the time of filing the benefit

request and must continue to be eligible through adjudication." 8 C.F.R. § 103.2(b)(1).

## B. Factual Background

### 1. The Investment

Plaintiffs in this case are foreign individuals who filed Form I-526 petitions with USCIS

on November 15, 2012 seeking permanent residence in the United States under the EB-5

Program. Each of the Plaintiffs filed their petitions based on the same investment: a $500,000

contribution to an Idaho Limited Partnership entitled Quartzburg Gold, LP ("Quartzburg Gold").

*See* AR 33-55.  The Plaintiff-investors were to serve as the limited partners in Quartzburg Gold, and an entity entitled ISR Capital, LLC, an Idaho Limited Liability Company, was to serve as its general partner.  *See generally* AR 200-227 (Quartzburg Gold, LP Limited Partnership Agreement) ("LPA").[3]

Quartzburg Gold's business plan was presented to Plaintiffs in a Confidential Private Offering Memorandum ("PPM").  AR 68-114.[4]  In sum, the PPM stated that Quartzburg Gold intended to aggregate Plaintiffs' $500,000 contributions and use them to finance several gold mining projects. AR 72.  This financing would take the form of a loan of the aggregate amount of the Plaintiffs' capital contributions to an entity entitled Idaho State Gold Company, LLC ("ISGC").  *Id.*  ISGC would in turn loan or invest the money it borrowed from Quartzburg Gold into several "Mining Companies" that would then pursue the gold mining projects.  *Id.*  The PPM explained how Quartzburg Gold would select the mining locations:

> Projects to be funded by ISGC with proceeds of the ISGC Loan will be identified by ISGC and approved by the General Partner. ISGC has identified, and the General Partner has approved, three initial Projects [Yellowjacket, Belshazzar, and Thunder Mountain].  In addition, a fourth initial Project, Monarch Mountain, has been

---

[3] The Plaintiff-investors in Quartzburg Gold entered into three interrelated agreements: the LPA, AR 200-27, a Master Escrow Agreement, AR 157-88 ("Escrow Agreement"), and a Limited Partner Interest Subscription Agreement, AR 189-99 ("Subscription Agreement").  The terms of the limited partnership, including the rights of the Plaintiff-investors, were set forth in the LPA. Under the LPA, in return for their capital contributions the limited partners, in aggregate, were entitled to an 80% share of the partnership, with the general partner retaining the remaining 20%. AR 200-27. Under the Escrow Agreement, U.S. Bank National Association agreed, in return for fees paid by Quartzburg Gold, to serve as an escrow agent and hold each investor's capital contribution pending approval of the investor's Form I-526 petition, at which time it would disburse those funds to Quartzburg Gold. AR 157-88. The Subscription Agreement provided that the Plaintiff-investor would be admitted into Quartzburg Gold as a limited partner upon release of his or her $500,000 capital contribution pursuant to the Escrow Agreement. AR 189-99.

[4] The Administrative Record contains two versions of the PPM. One version is from April 16, 2012. AR 1076-1121. The other version is from June 14, 2012. AR 68-114. Plaintiffs state that, attached to their Form I-526 petitions, "most of the investors submitted the June 14, 2012 version of the PPM." Pls.' Mot., ECF No. 144, 31. As such, the Court cites to the June 14, 2012 version of the PPM.

identified by ISGC but not yet approved by either ISGC or the General Partner pending satisfactory completion of due diligence. … To the extent that for any reason the full amount of the ISGC Loan is not required for the development of the initial Projects, the Partnership intends to invest in one or more other comparable projects to be identified by ISGC and to be subjected to similar due diligence review and evaluation. … As of the date of this Agreement ISGC has not committed to, and the General Partner has not approved any of such additional projects.

AR 72-74. The PPM went on to explain that even for the four initially identified mining locations, "[a]dditional drilling and other exploration work will be required on all four Initial Projects to confirm the available resources, and required permits will need to be applied for and obtained prior to mining production." AR 74. Additionally, if due diligence or other information indicates that development of the project is not warranted, "ISGC would intend to halt any further funding of that Project and re-deploy any remaining funds for the Project to an 'Additional Project.'" *Id.* However, again, ISGC had not committed to, and the General Partner, had not approved any of the additional projects. *Id.*

### 2. USCIS's Preliminary Responses to Plaintiffs' Petitions

Before beginning to issue the initial set of denials of Plaintiffs' visa petitions, which are not the subject of this Memorandum Opinion, USCIS sent Plaintiffs several preliminary communications notifying them of its intent to deny Plaintiffs' petitions and requesting additional evidence to address several perceived deficiencies therein. First, most of the Plaintiffs received from USCIS a "Notice of Intent to Deny" their Petitions ("NOID"). AR 327-36. In the NOID, USCIS took the position that the Plaintiffs had not provided sufficient evidence of the following in support of their petitions: (1) that the job creating entities ("JCEs") associated with the investment were located in a TEA, (2) that the minimum investment amount had been met, (3) that the capital invested was actually at risk, and (4) that the investment would create at least 10 full time positions for qualifying employees. *Id.*

Plaintiffs, through their shared representatives, each subsequently provided additional materials in response to the NOID. USCIS responded to those additional materials by issuing two Requests for Evidence ("RFEs"), in which USCIS requested additional evidence regarding such issues as whether the investment would create the required amount of employment and whether Plaintiffs' capital would genuinely be placed at risk. *See* AR 633-38; AR 656-67. Again, Plaintiffs submitted additional materials responding to the issues raised in the RFEs. With small differences not relevant to this Memorandum Opinion, this process was substantially the same for all Plaintiffs.

### 3. USCIS's Initial Denials of Plaintiffs' Petitions

After this initial round of notices and requests, USCIS began issuing denials to Plaintiffs' petitions on a rolling basis. Despite the fact that all of Plaintiffs' petitions were—at least for the purposes of this Memorandum Opinion—functionally equivalent, USCIS issued three different denial notices, each citing a different set of reasons for denying the petitions.

#### a. The First Denial

Although recognizing that other concerns had been raised during the NOID and RFE process, the first denial received by a number of the Plaintiffs stated that Plaintiffs had not established their eligibility for the EB-5 Program for a single reason—the capital Plaintiffs intended to contribute would not be "at risk" due to a call option which was originally present in the LPA. AR 26-32.

#### b. The Second Denial

USCIS had not issued the First Denial to all Plaintiffs by the time this lawsuit was filed. After the suit was filed, USCIS began issuing those Plaintiffs who had not yet received a final decision on their petitions a new and different denial notice. AR 902-918. The Second Denial similarly—although with different reasoning—cited the failure of the Plaintiffs to place their

capital at risk due to the call option and also added three additional reasons for denying the petition that were not present in the First Denial. In addition to the call option, the Second Denial stated that the Plaintiffs had not demonstrated that the JCEs associated with the investment were located in a TEA; had not shown that the full amount of capital would be made available to the business most closely responsible for creating the required employment; and had not demonstrated that the investment would create full time employment for at least ten qualifying employees. With the exception of the call option, none of these reasons for the Second Denial appeared in the First Denial.

### c. The Third Denial

Finally, a single Plaintiff received a slightly different denial than any other. This unique Third Denial included several reasons for denial that were present in the Second Denial, including that the Plaintiff had not demonstrated that the full amount of capital had been made available to the business most closely responsible for job creation, but omitted all other reasons. AR 1305-13.

### 4. The Court's March 10, 2017 Memorandum Opinion and Order

The parties filed Cross-Motions for Summary Judgment on March 11, 2016 and April 15, 2016 pertaining to whether or not USCIS's first set of denials of Plaintiffs' visa petitions were arbitrary and capricious, not supported by substantial evidence, and beyond the scope of USCIS's statutory authority. *See* ECF Nos. 60, 67. Ultimately, the Court granted in part and denied in part Plaintiffs' Motion and denied USCIS's Cross-Motion. ECF Nos. 103, 104. The Court concluded that USCIS's First Denial, given to a portion of petitioners, was arbitrary and capricious and counter to the evidence before USCIS. March 10, 2017 Memorandum Opinion, ECF No. 104, 2. Specifically, the Court granted in part Plaintiffs' Motion and found that the presence of a call option did not prevent Plaintiffs' capital from being at risk. *Id.* at 14. The

Court further concluded that USCIS acted arbitrarily and capriciously by issuing different denials to different petitioners even though the petitions and supporting documents were functionally equivalent. *Id.* However, the Court denied Plaintiffs' Motion to the extent it requested that the visa petitions be granted. *Id.* at 2. Instead, the Court remanded the case to USCIS for further consideration of Plaintiffs' visa petitions. *Id.* The Court expressly stated that "[o]n remand, the USCIS shall be free to exercise its discretion to reopen the administrative record, to engage in additional fact-finding, to supplement its explanation, and to reach the same or a different ultimate conclusion." *Id.* at 20.

### 5. USCIS's 2018 Denial of Plaintiffs' Visa Petitions

Pursuant to the Court's instructions, in September of 2017, USCIS issued Motions to Reopen ("MTRs") to all investors who had not withdrawn their investments, including Plaintiffs and non-Plaintiffs. AR 919-938. In the MTR, USCIS notified petitioners that, upon an initial review of the record, petitioners had failed to establish eligibility for EB-5 visas on multiple bases, including that petitioners had failed to establish that the JCEs were principally doing business in a TEA, that petitioners' capital was at risk, that petitioners' capital was made available to the businesses most closely responsible for job creation, and that petitioners' investment would result in full-time jobs for at least ten qualifying employees. *Id.*

Plaintiffs responded to the MTRs and filed additional documentation in an attempt to overcome the perceived shortcomings in their visa petitions. AR 939-1054. However, on April 3, 2018, USCIS issued the denial at issue in this Memorandum Opinion. USCIS denied Plaintiffs' visa petitions on three independent grounds. Based on the evidence submitted and the facts that existed at the time that Plaintiffs' filed their visa petitions, USCIS concluded that Plaintiffs failed to establish that (1) the JCEs were principally doing business in a TEA, (2) Plaintiffs'

investments would result in the creation of full time jobs for at least 10 qualifying employees, and (3) the required minimum amount of capital would be made fully available to the businesses most closely responsible for job creation. AR 1055-75.

Following the 2018 denial of their visa petitions, Plaintiffs filed a Fourth Amended Complaint. ECF No. 138. And, on March 7, 2019 and April 24, 2019, the parties again filed Cross-Motions for Summary Judgment. ECF Nos. 144, 146. Those Motions are currently before the Court.

## II. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, "when a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C. Cir. 2001). Accordingly, "the standard set forth in Rule 56[ ] does not apply because of the limited role of a court in reviewing the administrative record. . . . Summary judgment is [ ] the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Southeast Conference v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law;" "contrary to constitutional right, power, privilege or immunity;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or, in certain circumstances, "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A)-(C), (E). "This is a 'narrow' standard of review as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). However, an agency is still required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks omitted). "Moreover, an agency cannot 'fail[ ] to consider an important aspect of the problem' or 'offer[ ] an explanation for its decision that runs counter to the evidence' before it." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Prior to moving to the substantive discussion, the Court notes a dispute between the parties as to the proper scope of review under the APA. Plaintiffs challenge their visa petition denials under 5 U.S.C. § 706(2)(E), which requires the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be … unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E). USCIS contends that "substantial evidence" review under 5 U.S.C. § 706(2)(E) does not apply to the 2018 visa petition denial because the denial was not an exercise of a rulemaking function and did not require a public adjudicatory hearing. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971) (explaining that the substantial evidence standard applies "only when the agency action is

taken pursuant to a rulemaking provision of the [APA] itself … or when the agency action is based on a public adjudicatory hearing").

However, the Court need not resolve whether or not the "substantial evidence" scope of review applies in this case. As the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has explained "the distinction between the substantial evidence test and the arbitrary or capricious test is largely semantic." *Assoc. of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. Of Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984) (internal quotation marks omitted). The D.C. Circuit has described the APA's "scope of review" provisions as "cumulative." *Id.* at 683. "Paragraph (A) of subsection 706(2)—the 'arbitrary or capricious' provision—is a catchall, picking up administrative misconduct not covered by the other more specific paragraphs." *Id.* As such, "in those situations where paragraph (E) [the 'substantial evidence' standard] has no application …, paragraph (A) takes up the slack, so to speak, enabling the courts to strike down, as arbitrary, agency action that is devoid of needed factual support." *Id.* In such circumstances, where the arbitrary and capricious standard is used to ensure adequate factual support for agency action, "there is no *substantive* difference between what it requires and what would be required by the substantial evidence test." *Id.* at 683-84. Accordingly, the Court's analysis addresses whether or not USCIS's 2018 visa petition denial can be upheld under the full APA scope of review, including whether the denial is unsupported by substantial evidence.

## III.  DISCUSSION

The Court will now review USCIS's 2018 denial of Plaintiffs' visa applications under the applicable APA scope of review. USCIS denied Plaintiffs' EB-5 visa petitions on multiple, independent grounds. Plaintiffs do not dispute that USCIS's multiple grounds for denying their

visa petitions were independent. Because USCIS offered and defended with substantial factual support multiple, independent grounds for denying the visa petitions, USCIS need only show that one of the grounds for denial was sufficient in order to prevail in this matter. *See Indiana Municipal Power Agency v. FERC*, 56 F.3d 247, 256 (D.C. Cir. 1995) (explaining that an agency decision resting on many independent grounds can be sustained if any of those grounds is valid as long as there is no reason to find that the combined force of otherwise independent grounds influenced the decision).

The Court upholds the denial of Plaintiffs' visa petitions on two independent grounds. First, USCIS denied Plaintiffs' visa petitions because Plaintiffs failed to establish that it was more likely than not that the Job Creating Entities ("JCEs") which would receive Plaintiffs' investments were principally doing business in a Targeted Employment Area ("TEA"). Second, USCIS denied Plaintiffs' visa petitions because Plaintiffs failed to establish that it was more likely than not that their investments would create full time positions for at least ten qualifying employees. The Court concludes that USCIS's denials on these grounds should be upheld under the APA scope of review as not arbitrary and capricious, not unsupported by substantial evidence, not beyond the scope of USCIS's statutory authority, not in violation of congressional intent, and not contrary to Plaintiffs' Constitutional rights.

## A. Denial for Failure to Establish TEA Requirement

First, USCIS denied Plaintiffs' visa petitions because Plaintiffs failed to establish that it was more likely than not that the JCEs which would receive Plaintiffs' investments were principally doing business in a TEA. In their 2018 denial, USCIS explained that the initial evidence submitted with Plaintiffs' Form I-526 "failed to fully identify all of the JCEs that would be receiving EB-5 funds, and thus failed to establish that the relevant JCEs were principally

doing business in a TEA." AR 1062. USCIS went on to explain that Plaintiffs initially identified

four JCEs that would receive capital; however, the PPM indicated that not all the named JCEs

had been approved by the General Partner of ISGC. AR 1062; AR 73-74. The PPM further

indicated that other potential additional projects, which would be used as alternatives if the full

loan amount was not spent on the four initial projects or if one of the four initial projects fell

through, had also not been approved by the General Partner of ISGC. *Id.*

Based on these issues, in a Notice of Intent to Deny ("NOID"), USCIS informed

Plaintiffs that they had failed to establish that the four originally specified JCEs were doing

business in a TEA. AR 329. In response, Plaintiffs conceded that some investors could not claim

that all four or the originally identified JCEs were doing business in a TEA at the time of filing.

AR 339. But, Plaintiffs insisted that, even if not all the JCEs were in a TEA, the NCE was

principally doing business in a TEA. *Id.* Additionally, Plaintiffs provided an updated business

plan and evidence of TEA designations for a different set of JCEs, which included only two of

the four originally-identified JCEs. AR 362-430.

In its MTR, USCIS again raised the issue that Plaintiffs' had failed to establish the TEA

requirements at the time of filing. AR 924-26. Despite Plaintiffs' responsive arguments, USCIS

ultimately rejected Plaintiffs' petition, finding that Plaintiffs failed "to meet the TEA eligibility

requirements at the time the Form I-526 was filed … due to Petitioner's failure to fully identify

all of the JCEs at the time of the initial filing as well as the change of JCEs after filing." AR

1063.

Plaintiffs contest the denial of their visa petitions on the ground that they failed to meet

the TEA requirement at the time of filing. First, Plaintiffs argue that they were not required to

identify all JCEs at the time of filing because they had established that the New Commercial

Enterprise ("NCE") was principally doing business in a TEA, which was sufficient. Second, Plaintiffs contend that the change in JCEs after filing did not constitute a material change to their petitions. The Court will address both arguments in turn.

### 1. Failure to Establish JCEs prior to Filing Visa Petitions

First, the Court concludes that USCIS's determination that Plaintiffs failed to establish, at the time of filing, that it was more likely than not that the JCEs were principally doing business in a TEA was reasonable under the APA. If an immigrant investor invests his or her capital in a NCE that is principally doing business in, or creates jobs in, a TEA, then the immigrant investor need only invest a minimum of $500,000, rather than $1,000,000. 8 U.S.C. § 1153(b)(5)(C)(ii); 8 C.F.R. § 204.6(f)(2). For investments, such as Plaintiffs', made through regional centers, the term "principally doing business" applies to the JCE, not to the NCE. *See* 8 C.F.R. § 204.6(j)(6); *Matter of Izummi*, 22 I&N Dec. 169, 171-73 (BIA 1998) (in a regional center case where the NCE gave loans to various JCEs, the court found that "petitioner has not demonstrated that these companies are located in the particular census tracts that qualified" as TEAs); Policy Manual, Vol. 6, pt. G, ch.2 ("Investments through regional centers allow the immigrant investor to seek to establish indirect job creation. In these cases, principally doing business will apply to the job-creating entity rather than the new commercial enterprise. The job-creating entity must be principally doing business in the targeted employment area for the lower capital investment amount to apply.").[5] Here, the NCE was Quartzburg Gold, which pooled capital from immigrant

---

[5] Plaintiffs make a cursory argument that "the Policy Manual post-dates the NOID, RFEs, and initial denials." Pls.' Opp'n and Reply, ECF No. 149, 5 n.1. However, Plaintiffs introduce no evidence that the policy was different at the time Plaintiffs filed their visa petitions. Conversely, USCIS has introduced evidence that the Policy Manual's requirements for TEAs are the same as required by the policy in effect at the time of Plaintiffs' visa petition filing. Defs.' Reply, ECF No. 151, 5 n.3. Moreover, *Matter of Izummi*'s interpretation of the TEA requirement for

investors to loan—through the intermediary, ISGC—to various mining projects, which were the JCEs.

At the time Plaintiffs filed their visa petitions, they failed to fully identify all of the JCEs, or mining locations, which would receive their funds. In their initial petitions, Plaintiffs identified four JCEs which would receive the funds. However, the PPM acknowledged that not all of the named JCEs had been approved by the General Partner of ISGC. AR 68 (explaining that "a fourth Initial Project, Monarch Mountain, has been identified by ISGC but not yet approved"). Additionally, if the full capital investment was not spent on the initial projects or if the initial projects could not be completed, the PPM stated that the left-over funds would go to an additional project, none of which had been committed to by ISGC or approved by the General Partner. AR 74. Moreover, in response to the NOID from USCIS indicating that Plaintiffs had failed to establish that the four originally-identified JCEs were principally doing business in a TEA, Plaintiff's counsel admitted that the visa petitions included a business plan in which "not all" of the JCEs "were specifically and finally identified." AR 338. Plaintiff's counsel went on to identify a new set of JCEs, only two of which had been originally identified in Plaintiffs' visa petition. AR 339. As Plaintiffs failed to identify the JCEs at the time of filing their visa petitions, the Court concludes that it was reasonable for USCIS to conclude that they were unable to determine whether or not Plaintiffs' investments were more likely than not to go to JCEs principally doing business in a TEA.

However, Plaintiffs argue that their failure to fully identify the JCEs at the time of filing should not be detrimental to their visa petitions. Plaintiffs contend that, at the time of filing, they

---

petitioners investing in regional centers is in line with the Policy Manual. 22 I&N Dec. at 171-73.

had established that they had invested in an NCE which was principally doing business in a TEA because at least two of the original mining locations were located in a TEA. However, because Plaintiffs were investing through a regional center, the "principally doing business" requirement applies to the JCEs, not to the NCE. AR 1062; *see also* 8 C.F.R. § 204.6(j)(6); *Matter of Izummi*, 22 I&N Dec. at 171-73 (assessing whether the JCEs, not the NCE, were principally doing business in a TEA); Policy Manual, Vol. 6, pt. G, ch.2 (explaining that the JCEs must be principally doing business in a TEA). Pursuant to the regulations, policy, and precedent, it was reasonable for USCIS to require that each JCE was principally doing business in a TEA. As such, even if two of the four originally identified JCEs were doing business in a TEA and the NCE was principally doing business in a TEA, Plaintiffs' failure to identify the relevant JCEs at the time of filing prevented Plaintiffs from meeting the TEA requirement.

Plaintiffs further argue that USCIS's First Denial of Plaintiffs' visa petitions expressly found that Plaintiffs had invested in a TEA. AR 26-32. Additionally, Plaintiffs point out that other documents, such as the two RFEs, did not mention any problems with meeting the TEA requirement. AR 633-38; AR 656-67. Plaintiffs are correct that the First Denial was based only on the call option and described Plaintiffs' investment in the NCE as being "located within a targeted employment area." AR 28. Plaintiffs are also correct that some communications from USCIS prior to the 2018 denial did not highlight an issue with the TEA requirement. However, USCIS is not bound by a prior finding that is later determined to be erroneous. When an agency departs from a prior decision, that agency is required to provide a reasoned explanation. *Fox Television Station*, 556 U.S. at 514-16. In the 2018 denial, USCIS provided a reasoned explanation as to why it found that Plaintiffs failed to establish that that they were more likely than not to meet the TEA requirement. USCIS further explained that "the First Denial was

incomplete as it did not discuss important additional bases for denial." AR 1058. USCIS's explanation for changing course after the First Denial was reasonable. And, it would be "absurd to suggest that [USCIS] … must treat acknowledged errors as binding precedent." *Sussex Engineering, Ltd. v. Montgomery*, 825 F.2d 1084, 1090 (6th Cir. 1987); *see also Fogo de Chao (Holdings) v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1144 (D.C. Cir. 2014) (explaining that "[t]he mere fact that the agency, by mistake or oversight, approved a visa petition on one occasion does not create an automatic entitlement to the approval of a subsequent petition" (internal quotation marks omitted)).

Next, Plaintiffs contend that "[t]o the extent USCIS has required Plaintiffs to select all locations in advance, and stick with those locations no matter what, USCIS has created an additional eligibility requirement that simply does not exist in the statute or regulations." Pls.' Mot., ECF No. 144, 23. Plaintiffs rely on the prospective nature of the regulations to argue that they were not required to identify all JCEs at the time of filing. While the regulations may be prospective and anticipate that petitioners are in the process of investing at the time of filing, petitioners are not relieved of their obligation to meet all requirements at the time of filing. 8 C.F.R. § 103.2(b)(1) (explaining that an immigrant petitioner must "establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication"); *see also Matter of Izummi*, 22 I&N Dec. at 176 (explaining that USCIS "cannot consider facts that come into being only subsequent to the filing of a petition"). When investors, such as Plaintiffs, invest through a regional center, the locations of the JCEs are critical to EB-5 visa eligibility as the locations determine whether the petitioner has invested, or is in the process of investing, the required capital amount, which is lower if the investment is targeted at a TEA. 8 C.F.R. § 204.6(f)(2). And, lacking established locations of the JCEs, it was

reasonable for USCIS to conclude that it could not determine, at the time of filing, whether it was more likely than not that Plaintiffs would meet the TEA requirement.

Finally, Plaintiffs contend that USCIS improperly ignored evidence that Plaintiffs' capital was actually invested into mining activities in TEAs. While evidence that Plaintiffs' money was actually invested into a TEA is relevant, it is only probative insofar as it is used to establish that Plaintiffs were "eligible for the requested benefit at the time of filing the benefit request." 8 C.F.R. § 103.2(b)(1); 8 C.F.R. § 103.2(b)(12) (explaining that evidence submitted in response to a request is relevant only if it "establish[es] filing eligibility at the time the benefit request was filed"); *see also Izummi*, 22 I. & N. Dec. at 176 (refusing to consider facts which came into being after filing for purposes of deciding an EB-5 visa petition). Even if Plaintiffs' investment ultimately went to a TEA, it was reasonable for USCIS to conclude that Plaintiffs' original failure to establish the locations of the JCEs prevented Plaintiffs from showing, at the time of filing, that it was more likely than not that they would meet the TEA requirement. *See Wang v. USCIS*, No. 16-1965-TJK, 2019 WL 1756290, at *2 (D.D.C. April 19, 2019) ("USCIS will deny a petition if the petitioner becomes eligible only after the petition was filed.").

Plaintiffs also fault USCIS for ignoring evidence that the business plan was centered on providing investments to JCEs in a TEA. Similarly, Plaintiffs point out that USCIS ignored evidence of a contractual obligation for the ISGC General Partner to use the immigrant investors' capital in mining projects in a TEA. However, it was reasonable for USCIS not to rely on Plaintiffs' business plan because the business plan lacked necessary factual support, such as the locations of the JCEs. *In re Ho*, 22 I & N Dec. 206, 212 (BIA 1998) (in the context of the job creation requirement, refusing to rely on conclusory assertions in a business plan). And, any contractual assurances that Plaintiffs' capital would be invested in mining activities in a TEA is

similarly unavailing. USCIS is statutorily required to make the ultimate determination that an investment has been made in a TEA. As such, a contractual business agreement, to which USCIS was not a party, is of little probative value.

In sum, as one ground for denying Plaintiffs' visa petitions, USCIS determined that Plaintiffs had failed to establish, at the time of filing, that it was more likely than not that they were investing in JCEs which were principally doing business in a TEA. This failure occurred because of Plaintiffs did not establish the locations of the JCEs which would receive their investments prior to filing their visa petitions. The Court concludes that USCIS's denial on this ground was reasonable under the APA standards of review.

## 2. Material Change to JCE Locations

Relatedly, USCIS rejected Plaintiffs' visa petitions because the changes to the locations of the JCEs, made after the initial filing, constituted impermissible material changes. AR 1064. Plaintiffs argue that the changes in JCEs after filing did not constitute material changes to their visa petitions. The Court finds USCIS's determination that such changes were material to be reasonable under the APA standards of review.

In the 2018 denial, USCIS determined that the changes to the locations of the JCEs, made after the initial filing, were material "as they affect whether Petitioner's investment was within TEAs, which directly determined Petitioner's required minimum investment amount for eligibility." AR 1064. In defining materiality, USCIS cited *Kungys v. United States*, 485 U.S. 759 (1988). In *Kungys*, when interpreting a statute revoking citizenship, the United States Supreme Court defined a fact as material "if it has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed." 485 U.S. at 770 (internal quotation marks omitted). With this definition, USCIS determined that the

change in JCE locations was material as the change affected whether or not the JCEs were in a TEA, which in turn affected whether or not an investment of $500,000 rendered Plaintiffs qualified for an EB-5 visa. 8 U.S.C. § 1153(b)(5)(C)(ii); 8 C.F.R. § 204.6(f)(2).

Plaintiffs dispute USCIS's interpretation of materiality. Plaintiffs cite to USCIS's Policy Manual which states that "[c]hanges that occur in accordance with a business plan and other supporting documents as filed will generally not be considered material." Policy Manual, Vol. 6, Part G, ch. 4(C). According to Plaintiffs, the stated goal of their business plan was to invest in mining activities in TEAs located in the regional center. As such, any change which resulted in a JCE being located in a TEA cannot be material.

However, USCIS's Policy Manual is not adverse to the materiality standard in *Kungys*. Most changes that occur in accordance with the petitioner's business plan will not be material because most changes that occur in accordance with the business plan will not have a tendency to influence the visa petition eligibility determination. As the Policy Manual's example explains, if a business plan states that ten jobs will be created and, after filing, ten jobs are created, "such a change would not be considered material." Policy Manual, Vol. 6, Part G, ch. 4(C). Accordingly, USCIS's use of the materiality standard in *Kungys* was not unreasonable. 485 U.S. at 770 ("Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."). Ultimately, Plaintiffs appear to admit as much, agreeing that "[i]n order to be material, a fact 'must be of the sort that would affect the ultimate immigration decision.'" Pls.' Opp'n and Reply, ECF No. 149, 19 (quoting *Yang v. Holder*, 770 F.3d 294 (4th Cir. 2014)).

Moving to the substance of Plaintiffs' argument, even if the change to the locations of the JCEs was contemplated by the business plan, it was still reasonable for USCIS to conclude that the change to the locations was material. A business plan cannot simply approve any future changes such that those future changes will not be material. Allowing such an escape hatch in a petitioner's business plan would effectively destroy the materiality requirement. And, the materiality requirement is crucial to maintaining the fairness of the priority system for immigrant investor visas. An approved I-526 petition is given a priority date as of the date the petition is properly filed. 8 C.F.R. § 204.6(d). If petitions did not have to meet the EB-5 requirements at the time of filing and could be changed at will, then petitioners could file incomplete petitions in order to receive a better priority position for obtaining a visa. Allowing later changes to incomplete petitions would be unfair to those petitioners who waited to file their forms until the appropriate time when they had the evidence necessary to establish all EB-5 requirements.

Even using the materiality standard from *Kungys*, Plaintiffs argue that the change in JCE locations was not a material change. Plaintiffs contend that "[i]t appears that all combinations of locations proposed (and undertaken) have enough activity located in a TEA such that the NCE is principally doing business in a TEA." Pls.' Mot., ECF No. 144, 24-25. And, the job-creating activity at each site—mining— was the same. As such, Plaintiffs explain that their EB-5 visa eligibility could not have been affected by choosing one set of JCE locations over another, so the change in JCE locations was not material.

However, Plaintiffs' argument rests on a faulty premise. Plaintiffs contend that the change in locations of the JCEs was not material because all combinations of proposed JCE locations have enough activity occurring in a TEA so that the NCE is principally doing business in a TEA. But, again, because Plaintiffs invested through a regional center, the relevant entity

which must principally be doing business in a TEA is not the NCE but rather the JCEs. AR 1062; *see also* 8 C.F.R. § 204.6(j)(6); *Matter of Izummi*, 22 I&N Dec. at 171-73 (using JCEs as the relevant entity); Policy Manual, Vol. 6, pt. G, ch.2 (explaining that for investments through regional centers "principally doing business will apply to the job-creating entity rather than the new commercial enterprise"). USCIS determined that Plaintiffs failed to meet the TEA requirement because they failed to establish that the originally identified JCEs were principally doing business in a TEA. AR 1062-63. Plaintiffs then submitted a different set of JCEs. *See* AR 362-430. Insofar as these new JCE locations were an attempt to influence USCIS's decision on Plaintiffs' EB-5 eligibility, it was reasonable for USCIS to conclude that the change in JCE locations was an impermissible material change.

In sum, USCIS determined that the change in locations of the JCEs which would receive Plaintiffs' investments was an impermissible material change because the change had a natural tendency to influence the eligibility decision. The Court concludes that USCIS's denial on this ground was reasonable under the APA standards of review.

### 3. Conclusion

In the 2018 denial, USCIS denied Plaintiffs' EB-5 visa petitions on the ground that Plaintiffs failed to establish that it was more likely than not that their investments would go to JCEs which were principally doing business in a TEA. USCIS explained that, at the time of filing, Plaintiffs had not identified which JCEs would receive the investments and whether or not those JCEs were principally doing business in a TEA. Moreover, USCIS explained that, even if Plaintiffs could establish that the JCEs identified post-filing were principally doing business in a TEA, the change in the locations of the JCEs was an impermissible material change. For the reasons explained above, the Court concludes that denial on this ground was not arbitrary and

capricious, not unsupported by substantial evidence, not beyond the scope of USCIS's statutory authority, not in violation of congressional intent, and not contrary to Plaintiffs' Constitutional rights.

## B. Denial for Failure to Establish Job Creation Requirement

While the Court has already concluded that USCIS's 2018 denial of Plaintiffs' visa petitions should be upheld on one independent ground, the Court will nonetheless also address a second, independent ground for upholding the denial. In addition to denying Plaintiffs' visa petitions for failing to establish, at the time of filing, that their investments were more likely than not to go to JCEs in a TEA, USCIS also denied Plaintiffs' visa petitions for failing to establish that it was more likely than not that their investments would create full time positions for at least ten qualifying employees within two years. AR 1072-74.

In order to qualify for an EB-5 visa, immigrant investors must establish that it is more likely than not that their investment will create full time positions for at least ten qualifying employees. 8 U.S.C. § 1153(b)(5)(A). There are two methods of showing that an investment in a NCE will create full-time positions for at least ten qualifying employees within two years. First, an immigrant investor's petition can be accompanied by documentation, such as relevant tax records or Form I-9s, for ten qualifying employees if such employees have already been hired. 8 C.F.R. § 204.6(j)(4)(i)(A). Alternatively, a petitioner can provide "[a] copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired." 8 C.F.R. § 204.6(j)(4)(i)(B). For investments, such as Plaintiffs, in a NCE within a regional center, the employment positions can be created directly or indirectly by the NCE. 8 C.F.R.

§ 204.6(j)(4)(iii). Such indirect job creation must be demonstrated through reasonable methodologies such as "multiplier tables, feasibility studies, analyses of foreign and domestic markets for the goods or services to be exported, and other economically or statistically valid forecasting devices which indicate the likelihood that the business will result in increased employment." 8 C.F.R. § 204.6(m)(7)(ii).

In their visa petitions, Plaintiffs relied on the prospective, indirect creation of jobs through the NCE. However, in the 2018 denial, USCIS determined that "evidence in the record does not establish that the NCE will create at least 10 full-time positions for qualifying employees." AR 1073. As explained in the previous section, Plaintiffs' initial petition identified four JCEs, or mining locations, which would receive the investors' capital contributions through a loan made by the NCE. However, the four identified JCEs were only preliminary as at least one of the JCEs had not been approved by the General Partner of ISGC. AR 68. Additionally, the PPM identified other potential JCEs, which had also not been approved, in case investor capital was left over after the initial investments or the original mining locations were unworkable. *See Supra* Sec. III.A.1; AR 1073; AR 73-74. In response to USCIS's NOID, Plaintiffs provided an updated business plan with a new set of JCEs, which included only two of the four original JCEs. AR 362-430.

In the MTR, USCIS indicated that the failure to identify adequately the JCEs at the time of filing prevented Plaintiffs from establishing the job creation requirement. AR 935-38. In response, Plaintiffs filed a new economic report purporting to show that Plaintiffs' investments had already resulted in the creation of the requisite number of jobs. AR 969-1000.

Despite Plaintiffs' responses, USCIS denied Plaintiffs' visa petitions for failing to meet the job creation requirement at the time of filing. Absent identified JCEs, USCIS concluded that

Plaintiffs could not establish that, "due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired." 8 C.F.R. § 204.6(j)(4)(i)(B); AR 1073. Additionally, lacking identified mining locations in a comprehensive business plan, Plaintiffs could not provide an adequate economic impact report indicating indirect job creation using reasonable methodologies. AR 1073-74. Moreover, Plaintiffs' later-filed, updated business plan and updated economic report, which relied on JCEs not identified at the time of filing, constituted an impermissible material change as it affected Plaintiffs' ability to establish the job creation requirement at the time of filing. AR 1074.

Plaintiffs have three primary arguments as to why USCIS's denial on this ground was not reasonable under the APA standards of review. The Court will address each argument in turn.

First, Plaintiffs contend that the original Economic Report which was provided as an exhibit to the Form I-526, reflected the facts as they were at the time of filing and should have been considered as evidence that they met the job creation requirement. AR 281-326. According to Plaintiffs, the Economic Report was based on mining expenditures and was not based on the locations of the mining activities, or the JCEs. As such, Plaintiffs argue that, at the time of filing, they were able to demonstrate that they were more likely than not to invest money in mining activities which would result in the need for ten or more qualifying employees, even if the locations of the mines were not originally identified.

However, Plaintiffs ignore that their economic analysis is only reasonable insofar as the business plan underlying that analysis is sufficiently comprehensive. *See* 8 C.F.R.

§ 204.6(j)(4)(i)(B) (requiring a "comprehensive business plan" to show prospective job creation).[6] In order for a business plan to be sufficiently comprehensive

> [t]he plan should contain a market analysis, including the names of competing businesses and their relative strengths and weaknesses, a comparison of the competition's products and pricing structures, and a description of the target market/prospective customers of the new commercial enterprise. The plan should list the required permits and licenses obtained. If applicable, it should describe the manufacturing or production process, the materials required, and the supply sources. The plan should detail any contracts executed for the supply of materials and/or the distribution of products. It should discuss the marketing strategy of the business, including pricing, advertising, and servicing. The plan should set forth the business's organizational structure and its personnel's experience. It should explain the business's staffing requirements and contain a timetable for hiring, as well as job descriptions for all positions. It should contain sales, cost and income projections and detail the bases thereof. Most importantly, the business plan must be credible.

*In re Ho*, 22 I & N Dec. at 212. In sum, a comprehensive business plan must be "sufficiently detailed to permit USCIS to draw reasonable inferences about job-creation potential." AR 1072 (citing *In re Ho*, 22 I & N Dec. at 212). Because the original business plan lacked specified locations for mining, it was reasonable for USCIS to conclude that Plaintiffs' business plan was not comprehensive and could not support a credible economic analysis. AR 1073 ("Petitioner also cannot provide an adequate economic impact report indicating how indirect job creation can be demonstrated through reasonable methodologies.") As USCIS's Policy Manual states, "[i]n reviewing whether an economic methodology is reasonable, USCIS analyzes whether the multipliers and assumptions about the geographic impact of the project are reasonable." Policy Manual Vol. 6, Pt. G, ch. 2, § D.5. Lacking information about the location of the mines in the

---

[6] Plaintiffs make a conclusory argument that this regulation does not apply because they are relying on indirect job creation. Pls.' Mot., ECF No. 144, 26. However, this regulation falls under the heading "General." 8 C.F.R. § 204.6(j)(4)(i)(B). And, Plaintiffs fail to explain why this regulation would be inapplicable. Moreover, Plaintiffs concede that they were required to provide a comprehensive business plan. Pls.' Mot., ECF No. 144, 26. The application of 8 C.F.R. § 204.6(j)(4)(i)(B) does not prevent Plaintiffs from using "reasonable" methodologies to establish indirect job creation. 8 C.F.R. § 204.6(m)(7)(ii).

original filing, USCIS could not review whether or not Plaintiffs' assumptions about the geographic impact of the projects were accurate. As such, it was reasonable for USCIS to determine that the lack of established JCE locations rendered Plaintiffs' business plan not comprehensive, thus making the relied-upon economic analysis not credible.

The Court further finds that it was reasonable for USCIS to require geographic specifics about the locations of the JCEs prior to crediting a business plan or economic analysis for purposes of the job creation requirement. Mining locations obviously vary in size, scope, need, and other characteristics that affect the job opportunities provided. For example, some mines may require that more money be spent on construction, others may require that more money be spent on maintenance. Even if the activity—mining—remains the same at each location, changes in the locations of the mines could affect safety concerns, transportation issues, and other features which relate to a mine's ability to attract sufficient workers. The different features of various mines have a natural impact both on the types of employment opportunities and on potential workers' willingness to accept those opportunities. Lacking established locations of JCEs at the time of filing, it was reasonable for USCIS to discount any business plans or economic analyses purporting to prove that the job requirement had been met at the time of filing.

In at least one filing, the immigrant investors appeared to acknowledge that a failure to have finalized the mining locations impacted their ability to establish the job creation requirement. According to the June 14, 2012 PPM, "[i]n the event that ISGC or a Mining Company determines that it is not feasible to obtain the necessary permits, ISGC would intend to re-deploy the funding that had been allocated to such Project to a different project. *There is no assurance that ISGC could successfully locate such replacement projects that would provide a*

*sufficient number of qualifying new jobs to satisfy the requirements for investors to obtain U.S. permanent residency under the EB-5 program*." AR 92 (emphasis added). This PPM was attached to most investors' form I-526. Pls.' Mot., ECF No. 144, 31 ("most of the investors submitted the June 14, 2012 version of the PPM"). Given that filings attached to the most of the investors' visa petitions indicated that, if permits could not be obtained, there was no assurance that the regional center could locate mining projects which would provide the requisite number of jobs, it was reasonable for USCIS to conclude that Plaintiffs' business plan, which had not finalized the mining projects, was not credible for purposes of evaluating job creation. Even considering Plaintiffs' economic report, it was reasonable for USCIS to determine that, at the time of filing, Plaintiffs had not established that they were more likely than not to meet the job creation requirement.

Second, once again, Plaintiffs argue that post-filing changes to the locations of the mines were not material changes. According to Plaintiffs, the location of the mining activity is not material to determining whether or not the job creation requirement can be met. Moreover, the changes to locations were not material because such changes were in line with Plaintiffs' business plan. As such, Plaintiffs contend that their later-filed economic report showing the creation of 1,646 jobs was evidence that Plaintiffs met the job creation requirement. AR 975.

It was reasonable for USCIS to determine that the location of the mines was material to the job creation requirement. *See Supra* Sec. III.A.2. As explained above, the location of a mine, and the specific features of a mine, can have significant impacts on a mine's ability to attract workers. As such, the location of the mine is a fact of the sort that would affect USCIS's ultimate determination as to whether or not Plaintiffs were likely to meet the job creation requirement. *See Kungys*, 485 U.S. at 770 (setting the materiality standard). Moreover, the mere fact that

Plaintiffs' over-broad business plan allowed for changes to location does not render such changes immaterial. What matters is that the location of the mining activity affected the investment's job creation potential, a requirement for EB-5 eligibility. As such, even if Plaintiffs ultimately created a sufficient number of jobs at the JCEs which were identified after filing their visa petitions, it was reasonable for USCIS to find that the changes to the locations of the JCEs were impermissible material changes, which prevents Plaintiffs from using such evidence to establish the job creation requirement at the time of filing. 8 C.F.R. § 103.2(b)(1) (explaining that an immigrant petitioner must "establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication"); *see also Matter of Izummi*, 22 I&N Dec. at 176 (explaining that USCIS "cannot consider facts that come into being only subsequent to the filing of a petition").

Finally, Plaintiffs contend that USCIS's Policy Manual allowed investors to demonstrate job creation even if the locations of the JCEs were not yet known. Specifically, Plaintiffs rely on a provision of the Policy Manual which was in place at the time Plaintiffs filed their visa petitions and through USCIS's 2018 denial. Under that provision, "[USCIS] allowed an EB-5 investor to demonstrate job creation based on jobs to be created by prospective tenants of a building built with EB-5 money, even thought [sic] there was no direct relationship between the EB-5 entity and the prospective tenant, and the tenant was generally unknown at the time of filing." Pls.' Mot., ECF No. 144, 28 (citing Policy Manual, Vol. 6, Part G, ch. 2(D)(6)). Plaintiffs attempt to use this tenant occupancy methodology to argue that they can claim job creation based on the type of investment activity—mining—rather than on the location of the investment.

The Court begins by noting that the tenant-occupancy policy relied on by Plaintiffs is rescinded as of May 15, 2018. Policy Manual, Vol. 6, Part G, ch. 2(D)(6). However, regardless

of the policy's current status, it was reasonable for USCIS to conclude that the policy was not relevant to Plaintiffs' visa petitions. The policy involved the job creation requirement for prospective tenants in an identified commercial space built with capital from immigrant investors. Plaintiffs provide no evidence that USCIS ever applied the tenant-occupancy policy outside the context of investments in commercial spaces. And, even if the policy were to apply outside the context of investments in commercial spaces, it was reasonable for USCIS not to apply the policy in this case. Under the tenant-occupancy policy, immigrant investors could satisfy the EB-5 visa's job creation requirement, even if the tenants of a commercial space were unknown. But, while the identities of the prospective tenants, or the JCEs, were unknown, the size, nature, and location of the commercial space was known. Here, both the identities of the JCEs, or the mines, and the size, nature, and location of the mining activities were unknown. Lacking such information, it was reasonable for USCIS to conclude that Plaintiffs failed to establish that it was more likely than not that their investments would result in the creation of jobs for at least 10 qualifying employees.

In the 2018 denial, USCIS denied Plaintiffs' EB-5 visa petitions on the ground that Plaintiffs failed to establish that it was more likely than not that their investments would create at least 10 full-time positions for qualifying employees. USCIS explained that the denial was appropriate because, at the time of filing, Plaintiffs had not identified which JCEs would receive the investments, preventing Plaintiffs from being able to establish the requisite job creation potential. Absent the location of the JCEs, Plaintiffs could not submit a comprehensive business plan or a credible economic analysis. Moreover, even if Plaintiffs could establish that the JCEs, which were identified post-filing, created at least ten full-time positions for qualifying employees, the change in the locations of the JCEs was an impermissible material change. For

the reasons explained above, the Court concludes that denial on this ground was not arbitrary and capricious, not unsupported by substantial evidence, not beyond the scope of USCIS's statutory authority, not in violation of congressional intent, and not contrary to Plaintiffs' Constitutional rights.

## C. Plaintiffs' Various Claims in Fourth Amended Complaint

In Plaintiffs' Fourth Amended Complaint, Plaintiffs bring five claims for relief which are largely repetitious and cumulative. In Count One, Plaintiffs request relief under the APA arguing the 2018 denial was arbitrary and capricious (5 U.S.C. § 706(2)(A)); in Count Two, Plaintiffs request relief under the APA arguing the 2018 denial was in excess of statutory authority (5 U.S.C. § 706(2)(C)); in Count Three, Plaintiffs request relief under the APA arguing that the 2018 denial was unsupported by substantial evidence (5 U.S.C. § 706(2)(E)); in Count Four, Plaintiffs request relief under the APA arguing that the 2018 denial violated Congressional intent (5 U.S.C. § 706(2)(A), (C)); and in Count Five, Plaintiffs seek relief under the APA and the United States Constitution's Fifth Amendment arguing that the 2018 denial was contrary to a Constitutional right (5 U.S.C. § 706(2)(B)). *See* Fourth Am. Compl., ECF No. 138, ¶¶ 117-28.

For the reasons explained above, the Court has already determined that USCIS is entitled to summary judgment on Plaintiffs' Counts One, Two, and Three claims as the 2018 visa petition denial was not arbitrary and capricious, not in excess of statutory authority, and not unsupported by substantial evidence. In their Motion for Summary Judgment, Plaintiffs completely failed to develop their Count Four claim for a violation of congressional intent and Count Five claim for a violation of their Constitutional rights under the Fifth Amendment. Despite Plaintiffs' lack of argument, on its independent review, the Court concludes that Defendants are entitled to summary judgment on these Counts as well.

As to Count Four, Plaintiffs claim that USCIS's interpretation of the statute and regulations violates the congressional intent behind the EB-5 program. *Id.* at ¶ 125. In explaining how USCIS violated congressional intent, Plaintiffs argue that the denial was "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of a statutory right." *Id.* at ¶ 124 (quoting 5 U.S.C. § 706(2)(A), (C)). However, the Court has already determined that USCIS's 2018 visa petition denial did not violate 5 U.S.C. § 706(2)(A) or (C) as the denial was in accordance with law and not in excess of statutory authority. As such, the denial did not violate congressional intent and USCIS is entitled to summary judgment on Count Four.

As to Count Five, Plaintiffs argue that USCIS's denial was "contrary to constitutional right" in violation of 5 U.S.C. § 705(2)(B) and deprived Plaintiffs of due process and equal protection under the Fifth Amendment. *Id.* at ¶ 127. Specially, Plaintiffs contend that USCIS unreasonably delayed Plaintiffs' visa petitions by requiring additional submissions of evidence, wrongly denying the visa petitions based on the call option in the First Denial, and improperly concocting new grounds rejecting the petitions in the 2018 denial. *Id.* at ¶ 128. However, Plaintiffs provide no evidence that any of the delays in adjudicating and denying Plaintiffs' visa petitions were improper, let alone unconstitutional. USCIS is entitled to request additional information when deemed appropriate, and Plaintiff has introduced no evidence that such requests were inappropriate. 8 C.F.R. § 204.6(j). And, while USCIS's First Denial of Plaintiffs' visa petitions on account of the call option was contrary to the evidence, Plaintiffs have provided no evidence that the denial was unconstitutional. Moreover, following the initial set of denials, USCIS reopened and reconsidered the visa petitions of both Plaintiffs and non-Plaintiff petitioners. Finally, the Court has found that the 2018 visa petition denial was reasonable under

the APA standards, and Plaintiffs have provided no evidence that the denial was unconstitutional. Accordingly, Defendant is entitled to summary judgment on Count Five.[7]

## IV. CONCLUSION

In conclusion, the Court DENIES Plaintiffs' Motion for Summary Judgment and GRANTS Defendants' Cross-Motion for Summary Judgment. USCIS denied Plaintiffs' visa petitions because Plaintiffs failed to establish that it was more likely than not that the JCEs which would receive Plaintiffs' investments were principally doing business in a TEA, and, independently, because Plaintiffs failed to establish that it was more likely than not that their investments would create full time positions for at least ten qualifying employees. For the reasons explained above, the Court concludes that the 2018 visa petition denial on these grounds should be upheld under the APA standards of review as not arbitrary and capricious, not in excess of statutory authority, not unsupported by substantial evidence, not in violation of congressional intent, and not contrary to a Constitutional right. An appropriate Order accompanies this Memorandum Opinion.

        _____/s/_____
        COLLEEN KOLLAR-KOTELLY
        United States District Judge

---

[7] In addition to requesting summary judgment, in the event that Plaintiffs' visa petitions were remanded for reconsideration, Plaintiffs also requested an injunction barring USCIS from denying Plaintiffs' petitions on the ground that the Regional Center was terminated. Pls.' Mot., ECF No. 144, 42-49. However, because the Court is granting summary judgment in favor of USCIS and not remanding the 2018 visa petition denial, the Court need not address this request.